*Clk's copy*

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW MEXICO

GERALDINE LUJAN,                    )
                                    )
            Plaintiff,  **FILED**   )  CIV. 95-0607 M/DJS
            UNITED STATES DISTRICT COURT consolidated with Civ. 97-23-M/DJS
      v.    ALBUQUERQUE, NEW MEXICO )
                                    )
WILLIAM J. PERRY, Secretary **MAY 1 0 1999**  MEMORANDUM OPINION
Department of Defense,              )
                                    )
            Defendant                _____
                                    CLERK

            Geraldine Lujan (Lujan) was employed as a Voucher

Examiner and Accounting Technician by the defendant's office of

contract payments, Defense Finance and Accounting Services

(DFAS), an agency under the aegis of the Department of Defense,

at Kirtland Air Force Base, New Mexico.  Lujan brought suit on

June 7, 1995, alleging that she was discriminated against in

violation of the provisions of 42 U.S.C. § 2000e-16 and the Civil

Rights Act of 1991.  Essentially, she claims that she was

retaliated against by DFAS for having filed complaints with the

EEO department of DFAS.  In addition, plaintiff contends that she

was subjected to a hostile work environment because of her EEO

actions.

            Trial to the Court was held on February 8-12, 1999.

Evidence was adduced on behalf of plaintiff and the defendant,

and the parties furnished the Court with trial briefs.  At the

conclusion of the trial, having reviewed the plaintiff's

complaint, the defendant's answer, the pretrial order, the briefs

and considering the evidence adduced, the Court dictated into the

record certain findings of fact and conclusions of law, which by

this reference are incorporated herein. This matter is now ready for final decision and, pursuant to Fed. R. Civ. P. 52(a), the Court makes the following additional findings of fact and conclusions of law.

## I. **FACTS**

Lujan began working for the Department of Defense in October of 1986 when she was hired as an Accounting Clerk, GS-4 level, by the Air Force Contract Management Division at Kirtland Air Force Base. For her work in this position from October 1986 until June 1987, Lujan received periodic appraisal report ratings of "Excellent" from her supervisor Theresa Baca. (*See* Exhibits 4, 5.) In July, 1987, Lujan was promoted to an accounting technician, level GS-5. In July of 1989, plaintiff was promoted to Voucher Examiner, GS-6, as a result of a mass position reclassification. (*See* Exhibit 11.) She remained in this position until the division office at Kirtland Air Force Base closed in late 1995. The events of the closing of the Kirtland Air Force Base office and plaintiff's subsequent employment by another agency are not at issue or involved in this action.

Plaintiff has filed at least twenty-eight (28) informal or formal complaints, one of which was treated as a "whistle blower" complaint. With one exception, these complaints are in letter form and are either identified at the outset as an informal complaint or a formal complaint. The one exception is Exhibit 62, dated October 5, 1992, which is on a CSC Form 894. In completing this form, she alleged only retaliation and did not check any box indicating discrimination on the basis of race,

-2-

color, religion, national origin or sex.  In an attachment to her complaint, she states:

> In April, 1992, I discovered
> derogatory memos in my personnel
> folder which were dated 1988.  I
> have alleged that these memos were
> written and kept in my folder all
> these years in retaliation to my
> having filed an EEO complaint in
> 1988.

This exhibit as well as the others which are Exhibit 47 (May 19, 1992), Exhibit 50 (June 9, 1992), Exhibit 59 (September 4, 1992), Exhibit 61 (September 30, 1992), Exhibit 72a (April 10, 1993), Exhibit 84 (October 2, 1993), Exhibit 107 (March 3, 1994), Exhibit 117 (April 11, 1994), Exhibit 115 (April 11, 1994), Exhibit 127 (May 12, 1994), Exhibit 133 (May 16, 1994), Exhibit 134 (May 16, 1994), Exhibit 173 (July 7, 1994), Exhibit 174 (July 11, 1994), Exhibit 188 (August 16, 1994), Exhibit 189 (August 17, 1994), Exhibit 209 (August 29, 1994), Exhibit 237 (October 31, 1994), Exhibit 238 (October, 1994), Exhibit 239 (November, 1994), Exhibit 240 (November 4, 1994), Exhibit 241 (November 5, 1994), Exhibit 242 (November, 1994), Exhibit 246 (November 25, 1994), Exhibit 252 (December, 1994), Exhibit 255 (December, 1994), Exhibit 263 (April 3, 1995), Exhibit 264 (April 3, 1995), Exhibit 266 (April 11, 1995), only claim retaliation as the basis for her complaint, whether formal or informal.  At no time has she filed either an informal or formal complaint with the EEO claiming that she was retaliated against because of race or sex.  In Exhibit 62, she alludes in her letter to "having filed an EEO complaint in 1988."  There is no evidence of such a complaint.

-3-

All of her complaints appear to originate from certain events which occurred in 1987 and 1988. In November of 1987, a hand-written memo (Exhibit 48), was placed in plaintiff's personnel file. That memo referenced an incident which occurred on October 30, 1987, when plaintiff was seen by one Maria Padilla and Mary Brazell using a tape recorder in the office. It was also reported by Louise Chall who was acting as plaintiff's supervisor that plaintiff's attitude was very rude and that she had made rude remarks.

In January of 1988, the plaintiff had placed a picture of Martin Luther King, Jr., on her desk, recognizing the holiday. The plaintiff claims that after the holiday had passed, Louella Wallace, her supervisor, came by and took the picture down, saying that the holiday was now over. She testified that she felt the incident "was discrimination because it was like a racial slur, and it was a racial slur against me as a minority, as an Hispanic woman." During the period of January, 1988, to April, 1988, the plaintiff reported this action of Louella Wallace to her superiors and claims that at one stage she went to the EEO office and visited with them about the incident. However, she has admitted that she never instituted or initiated any proceedings through the EEO, and after visiting with a Ms. Billy Newby, an employee with the DFAS-EEO office, she decided not to pursue the matter.[1]

---

[1]     See Memorandum Opinion, page 2 (Filing No. 53) of Judge Bruce D. Black on defendant's motion for summary judgment or to dismiss.

-4-

On April 7, 1988, a hand-written memo was prepared by Louella Wallace recording a meeting which she had with Louise Chall, Teresa Robert, and Major Leu, regarding a conversation between plaintiff and Louise Chall the preceding day in which the plaintiff accused Louise of gossiping about another employee and in which the plaintiff allegedly stated: "She wanted this type of thing stopped." Ms. Wallace visited with the plaintiff about this incident, during which Ms. Wallace reminded the plaintiff that it was Ms. Wallace's responsibility to resolve problems in the office and that she was out of line in her action of accusing Louise. This memo (Exhibit 49) was also placed in plaintiff's personnel file.

It was after April of 1992 that she commenced filing her "informal" and "formal" complaints. These complaints claim retaliation took the form of failing to grant her promotions to positions with higher GS classifications and for which she claimed she was better suited than the person receiving the promotion, the failing of the DFAS-EEO office to more promptly and efficiently handle and respond to her complaints, complaints about the manner in which she was performing her job or in the imposing of requirements on her job performance, on the job performance ratings she received, and of counseling sessions by her supervisors.

In April 1992, Lujan was outraged to discover the two memos (Exhibits 48 and 49) in her file. She considered them to be derogatory and believed that Wallace placed these memos in

Lujan's file in retaliation for her going to the EEO about the
Martin Luther King, Jr., incident, even though one of them
preceded that incident by two or three months. Lujan further
believed that these memos were affecting her chances for
promotion. She sent an Electro Mail Transmittal dated in May
1992, to Jim Connor, an EEO Counselor at DFAS in Ohio,
complaining that these memos were left in her file. (*See* Exhibit
47.) Lujan followed up with a typed letter to Connor on June 9,
1992, claiming that she was "being discriminated against in
reprisal for my having filed a previous complaint" and that
because of these derogatory memos left in her file, she failed to
receive several promotions, for which she applied in May 1989,
June 1989, July 1989, November 1989, September 1991, January
1992, and February 1992. (*See* Exhibit 50.[2]) After these memos
were brought to his attention, in June 1992, Robert Romero
(Romero), Lujan's second-line supervisor, ordered that these
letters be removed from Lujan's file. (*See* Exhibit 51.) Lujan
received a civilian performance rating of "fully successful"
dated May 4, 1992, by her supervisor Pat Green and Robert Romero,
Chief of Contract Services Division. (*See* Exhibit 45.) Major
(now Lt. Col.) Martha Beattie signed the rating form on June 3,

---

[2]     Lujan attempted to submit exhibits relating to her
being denied promotions in 1989-1991, but the district court,
Judge Black, previously ruled that because Lujan did not timely
contact an EEO counselor about her supervisor's alleged
retaliatory failures to promote between April 1988 and May 1992,
Lujan failed to exhaust her administrative remedies with respect
to these claims and they were dismissed. (See Filing No. 53,
Memorandum Opinion in response to motion to dismiss or motion for
summary judgment (Dec. 1996)).

1992, at which time the rating was apparently given to Lujan.
Lujan testified at trial that her supervisors were aware of her
EEO complaint about the memos being left in her file before they
gave her this "fully successful" rating, which was two steps
below an "excellent" rating.

In July, 1992, an incident occurred in which Lujan
claimed she was the subject of retaliatory treatment. Usually,
her work was required to be submitted on the last day of the
month. On July 30, 1992, however, Lujan's supervisor requested
her work one day early. However, this request was made of all
Voucher Examiners at that time. Lujan responded that she had not
finished and asked for extra time. She failed to complete her
work one day early as requested. Lujan was called into her
supervisor's office on or about August 4, 1992, for this incident
where she was given an oral admonishment. (*See* Exhibit 59.[3])
She testified that on August 3, 1992, two of her supervisors, Jim
Carroll (Carroll) and Romero started yelling at her and wanted to
know why she reported the July 30 incident to Lt. Col. Martha
Beattie. Lujan stated that if they did not stop yelling at her,
she would have to leave the meeting, and she ultimately walked
out. On September 4, 1992, Lujan filed an EEO complaint for this
incident. (*See* Exhibit 59.) On September 10, 1992, Lujan was
given on oral admonishment by Romero for walking out on him at

_____

[3]     Although Lujan states in Exhibit 59, that WordPerfect
was removed from her computer on August 7, 1992, Lujan did not
present any evidence concerning this incident, and the Court will
therefore, not discuss it further.

-7-

the August 3rd meeting. On September 30, 1992, Lujan filed an EEO complaint claiming that this admonishment was in retaliation for her filing EEO complaints. (*See* Exhibit 61.) In October 1992, Lujan filed a formal complaint with the EEO for reprisals against her for participation in a protected EEO activity, alleging that the derogatory memos were kept in her file in retaliation for her filing her 1988 EEO complaint, and that Jim Connor attempted to persuade Lujan not to file an EEO complaint. (*See* Exhibit 62.)

On April 2, 1993, Linda Hale wrote a memo to Jim Carroll and Joann Bowens, Chief, Contract Services Division, stating that pursuant to Lujan's request, she was removing Lujan from the Hughes Aircraft contract. (*See* Exhibit 70.) Lujan made a handwritten notation at the bottom of this memo that she did not request to be removed from this contract. However, the transfer had already been made, and the testimony of Linda Hale refutes plaintiff's testimony that she did not request the transfer. What plaintiff did is change her mind, and it was too late. On April 7, 1993, Carroll transferred Lujan to another contract assignment. (*See* Exhibit 72.) On April 10, 1993, Lujan filed an informal complaint with the EEO, alleging that she was being transferred to another unit in retaliation for her filing EEO complaints. (*See* Exhibit 72a.) Lujan also re-alleged her denial of promotions, and included denials of promotions in July 1992, and January 1993. Lujan requested compensatory damages of $300,000 and a promotion with back pay. In May 1993, Lujan

-8-

received a performance rating of "fully successful" from Joann
Bowens. (*See* Exhibit I.)

Lujan expressed frustration that the EEO was not
investigating her complaints and that the delay was retaliatory.
In August 1992, Lujan had written a letter to Les Aspin, the
Secretary of Defense, stating that her EEO complaints had been
ignored and requesting that he conduct an investigation
concerning her EEO issues and that office's non-compliance with
federal regulations. (*See* Exhibit 81.) In September 1993, Lujan
received a letter in response from Ronald Hovell (Hovell),
Director of DFAS, Ohio, stating that her complaints were not
being ignored. (*See* Exhibit 82.) The letter further noted that
Lujan had pursued review of identical complaints through various
adjudication systems, including the negotiated grievance system,
the Federal Labor Relations Authority, and the Office of Special
Counsel. He advised her of the two options available, and that
she can only select one. *Id.* The letter also stated that an EEO
representative, Karen Sicilian (Sicilian), flew to New Mexico on
August 26-27, 1993, and that while Lujan was informed of her
coming and her ability to schedule an appointment, Lujan failed
to do so.

In October 1993, Lujan was given a written counseling
memo by her supervisor, Cassandra Trujillo (Trujillo), stating
specific instances where Lujan failed to met certain performance
elements and tasks. (*See* Exhibit 83.) The memo also noted
Lujan's poor attitude toward her fellow workers and Trujillo. On

-9-

October 20, 1993, Lujan wrote a letter to Hovell, claiming that her recent counseling memo was a retaliatory act. (*See* Exhibit 84.) She also noted the EEO's office failure to comply with specific federal regulations which require an investigation within 180 days. Lujan further alleged that Sicilian "has done nothing but harass me." (*See* Exhibit 84.) Lujan received a letter from Hovell informing her of the status of her EEO complaints and investigation. (*See* Exhibit 84.) The next day, October 21, 1993, Lujan sent a memo to Trujillo, disagreeing with each element in the counseling memo which Trujillo stated had not been performed adequately and requesting that the counseling memo be withdrawn within 30 days, or she would contest it through the EEO. (*See* Exhibit 85.) In response, Trujillo sent Lujan a memo addressing why Trujillo believed the counseling memo was appropriate and addressing specific instances of Lujan's attitude problems. (*See* Exhibit 88.) On October 26, 1993, Lujan submitted a letter to Tony Gallegos, Chairman of the U.S. EEOC in Washington, D.C., complaining that nothing had been done about her EEO complaints for the seventeen months since she filed her first complaint. (*See* Exhibit 87.)

During the first week of December, Sicilian sent several letters to Lujan, advising her that her complaints were being consolidated and divided into two parts, advising her of the EEO process and options available to Lujan, and stating that she would be in New Mexico to meet with Lujan and her representative, Max Hernandez (Hernandez), on December 8, 1993.

(See Exhibit 92.) The attachments to this letter summarize the pending claims of the plaintiff.

In March 1994, Lujan wrote an informal complaint to the EEO, alleging that Merle Roth (Roth), assigned to investigate plaintiff's complaints, was refusing to conduct a fair and unbiased investigation of Lujan's discrimination claims, by insisting that Lujan meet with her without her representative, by refusing Lujan's declaration because it was not prepared subject to the law of perjury, and by demeaning Lujan even after learning Lujan had been seeking medical treatment. (See Exhibit 107.) Lujan also made other allegations against Sicilian and Roth concerning the treatment she was receiving from this EEO investigation. Id. (See also Exhibit 117 - formal complaint.)

In March, 1994, Lujan also complained to David Younce about the distribution of the workload in her unit. Trujillo responded to Younce that she had assigned Lujan some additional work from another employee, and that she informed Lujan that if she needed any help to ask her or her lead person. (See Exhibit 108.) Trujillo's memo again addressed specific workplace interactions with Lujan and stated that Lujan had the lightest workload in her area. Id. Lujan submitted an informal complaint against Trujillo and Younce for these incidents. Lujan directly disputed that she had a light workload by stating that she was ranked fifth overall in the unit. (See Exhibit 115.) Lujan also alleged that Trujillo presented her with an unfair performance review and plan, which was drafted to doom Lujan to failure, and

refused to make changes to the plan which Lujan suggested, in retaliation for having complained to Younce about Trujillo. *Id.* The evidence established, and plaintiff admitted, that all of the Voucher Examiners received the same performance plan. Lujan further claimed that other employees wasted time gossiping and socializing, stating that Trujillo was overly critical of Lujan's work and never reprimanded these other employees. *Id.* (*See also* Exhibit 121.)

Also in March, 1994, Lujan claimed that some employees were being paid overtime to work on their contracts over the weekend. Lujan requested to work overtime, but her request was denied by Trujillo because enough employees had already volunteered to help with the project. (See Exhibit 110.) Lujan's complaint to the EEO also charged that this denial of overtime was retaliatory. (See Exhibit 115.) The evidence (Exhibit 110) establishes that Lujan was given the same opportunity as all other employees to do overtime work on a boxing project, and she that had not volunteered or requested to participate. The overtime work did not involve working on their respective contracts.

On May 11, 1994, Lujan was issued a counseling memo from Trujillo for errors Lujan made in her work and corrections which were required. (*See* Exhibit 126.) In this memo, Trujillo noted that "Many of the errors I found could have been prevented by you if you would use your time productively instead of monitoring other employees." *Id.* On May 13, 1994, Trujillo and

-12-

Younce presented Lujan with two counseling memos. The first involved an error Lujan made on the Rocketdyne contract, where the contract had not been "final paid" when Trujillo told Lujan to final pay the contract days ago. (*See* Exhibit 129.) The second involved numerous contra payments Lujan made within a two week time frame, which Trujillo stated Lujan must correct in three days time. (*See* Exhibit 130.) On May 16, 1994, Lujan requested an extension of time and this request was granted by Trujillo. (*See* Exhibit 131.) On May 16, 1994, Lujan filed an informal and formal complaint against Trujillo and Younce for these incidents and for escorting her to meetings in front of other employees. (*See* Exhibits 133, 134.) Lujan also alleged that she was denied a promotion in April 1994 in retaliation. *Id.*

On May 20 and May 23, 1994, Lujan sent Trujillo memos, disagreeing with the errors Trujillo said Lujan made, and alleging that Trujillo scrutinized Lujan's work at a level much higher than other employees and was setting Lujan up for failure. (*See* Exhibits 135, 138.)

On May 12, 1994, Lujan filed a complaint of reprisal for whistle blowing with the Office of Special Counsel in Washington, D.C. (*See* Exhibit 127.) This reprisal for whistle blowing was looked into, investigated, and findings were made that there was no improper conduct as claimed by Lujan. Lujan has not complained that those things she complained about constituted the basis for any retaliatory actions against her.

On June 20, 1994, Lt. Col. Douglas Bennett (Bennett) sent Lujan a letter assuring her that no one was trying to make her fail in her job, but that he was concerned about her job performance and her reluctance to acknowledge shortcomings on her part. (*See* Exhibit 160.) In June 1994, Lujan was given a performance rating of "fully successful" by Trujillo which also stated that Lujan "has experienced some difficulty maintaining a consistent level of acceptable performance." (*See* Exhibit 158.)

In response to this language in her performance evaluation, Lujan filed an "informal complaint" on July 7, 1994, claiming that the derogatory paragraph entered in Block 8 of her performance evaluation was a retaliatory act and requesting that such language be removed. (*See* Exhibit 173.) This was followed by a formal complaint in August 1994 concerning the language of Block 8 and the "collusion" between Bennett and Lujan's supervisors to attack her through the appraisal procedure in retaliation for filing EEO complaints. (*See* Exhibit 189.) On July 11, 1994, she filed an informal complaint regarding Bennett's failure to respond within ten days to her May 26, 1994, grievance. (*See* Exhibit 174.)

At the end of July, 1994, Trujillo sent a memo to Lujan stating that the quality of her work had improved substantially. (*See* Exhibit 176.) Bennett also sent Lujan such a memo acknowledging her improvement. (*See* Exhibit 180.)

Exhibit 177, while not a basis for a retaliation complaint, illustrates the paranoic character of plaintiff. By

-14-

that exhibit, plaintiff complained that during July, 1994, she had been sent letters thanking her for her magazine subscriptions, books and videos, which she never ordered. Lujan alleged that someone in the government was trying to harass her by sending her these materials. Bennett responded to Lujan's letter by stating that DFAS General Council informed him to have Lujan prepare a form letter to send to these magazine companies stating that these materials were unordered. He also stated that prosecution is normally not pursued unless there is a substantial monetary loss. (*See* Exhibit 178.)

An incident occurred in early August 1994, which resulted in more complaints of retaliation by Lujan. On August 10, 1994, according to Lujan, one of her co-workers told her she had a phone call. Lujan picked up the phone, but another of her co-workers, Lydia Duran (Duran), was on that line. Allegedly Duran yelled at Lujan to get off the line. Lujan believed that these two co-workers staged this telephone call in order to support a complaint to Bennett. (*See* Exhibit 188.) As a result, on August 16, 1994, Lujan filed an "informal complaint" of retaliation based upon these events. (*See* Exhibit 188.) Bennett investigated these events and concluded that Lujan should have hung up the phone as soon as she was asked by Duran, and that there was no indication that the incident was staged. (*See* Exhibit 208.) Lujan filed a complaint on August 29, 1994 alleging retaliation for the phone incident and verbal abuse as well as retaliation by Bennett in ignoring her complaints and

siding with Duran, giving her preferential attention. (*See* Exhibit 209.) In this complaint, Lujan also alleges many other instances of retaliation during the month of August 1994, including her being precluded from having a representative at counseling sessions and generally, her supervisors acting in collusion to harass and retaliate against her. Lujan later filed a formal complaint on this same subject. (*See* Exhibit 241.)

On August 31, 1994, Lujan was given a written counseling memo, concerning a variety of errors and backlogs in her work performance the latter half of August 1994. (*See* Exhibit 221.)

Lujan kept a detailed log of errors, not her fault, which occurred in processing and paying contracts in her department during September and October 1994. (*See* Exhibit 235.) On October 31, 1994, Lujan filed an informal complaint of retaliation relating to the letter of September 28, 1994, in which Lujan alleges Ms. Elayne Bennett lied about giving her a final EEO counseling interview. (*See* Exhibits 237, 240.) On October 31, 1994, Lujan filed a formal complaint about Ms. Bennett's lie and the events of April-May 1994 involving Younce. (*See* Exhibit 238.)

On November 5, 1994, Lujan filed a formal complaint of retaliation which related to the events of August 1994 and the telephone incident. (*See* Exhibit 242.) On November 25, 1994, she filed an informal complaint of discrimination containing a multitude of allegations of a hostile work environment condoned

-16-

by Bennett, Trujillo, Linda Hale, Karen Sicilian and the preferential treatment given to Lujan's co-workers who were not counseled for their work errors. (*See* Exhibit 246.) Lujan alleges that the constant unjustified counseling sessions made her work unreasonably difficult and her job environment created stress, anxiety and overwork. *Id.* In this complaint, Lujan nowhere alleges that this hostile environment was due to her sex or race, rather she states that she was subjected to a pattern and policy of harassment, intimidation, and reprisal. (*Id.* at ¶ 23.)

In December 1994, the EEO began an investigation into Lujan's complaints and investigators met with Lujan at Kirtland Air Force Base on December 5, 1994. Lujan filed a complaint against Trujillo for harassing her in retaliation for Lujan meeting with EEO personnel. (*See* Exhibit 255.) Lujan alleged that Trujillo loaded her with work when Trujillo knew she was taking sick leave for an appointment with her doctor. *Id.* Lujan further alleged that Bennett denied her adequate leave time to prepare for investigation of her complaints and her EEO hearing before an ALJ. (*See* Exhibits 249, 263.) On December 5, 1994, Lujan filed a formal complaint dealing with events previously complained of in her informal complaints of April 11, 1994, May 16, 1994, and September 12, 1994. (*See* Exhibit 252.) Lujan also alleged that her supervisors ignored her complaint about a poster advertising "Taco Day" which featured a Mexican individual taking a nap, which Lujan found racially offensive. *Id.*

In mid-December 1994, Lujan took a 30-day leave of absence from work at the suggestion of her physician. She returned to work in January 1995. Due to a reoccurrence of her symptoms, Lujan again took a 30-day leave of absence upon the advice of her doctor. Her doctor recommended a six-hour work day for Lujan when she returned to work. Defendant accommodated this recommendation.

On April 3, 1995, Lujan filed an informal complaint claiming that the numerous actions set forth in her informal complaint constituted retaliation. (*See* Exhibit 264.) In fact, Lujan alleged that the agency retaliated against her by holding this hearing at a time when it knew Lujan could not attend due to medical reasons. *Id.* On April 11, 1995, she filed an informal complaint of retaliation against Lt. Col. Bennett for denying her medical accommodations, and as usual, other matters. (*See* Exhibit 266.)

The foregoing constitutes a very lengthy, although not exhaustive, summary of plaintiff's complaints. As noted, these generally are taken from the exhibits plaintiff offered to support her claim. However, most of these formal and informal complaints were received solely to prove the complaint was made, not for the truth of claims asserted. There is virtually no corroborative evidence supporting plaintiff's perception that the actions she complains about were retaliatory.

The defendant presented testimony and exhibits which addressed the actions taken, describing the underlying business

justification for those actions and in some instances denying plaintiff's claims. No rebuttal evidence was presented by the plaintiff.

## II.  DISCUSSION

Title VII provides that all personnel actions affecting employees or applicants for employment in military departments (including the Air Force) shall be made free from any discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-16(a). Title VII also prohibits retaliation against an employee because she made a charge against her employer for an unlawful employment practice. 42 U.S.C. § 2000e-3(a). The federal government specifically is prohibited from retaliating against persons "for opposing any practice made unlawful by title VII of the Civil Rights Act . . . ." 29 C.F.R. § 1614.101(b).

### A.  Hostile Work Environment

To establish a hostile work environment claim the plaintiff must show that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and (2) the harassment was racial or stemmed from racial animus. *Trujillo v. University of Colorado Health Sciences Center*, 157 F.3d 1211, 1214 (10th Cir. 1998). "The very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of

-19-

workplace equity." *Harris v. Forklift Systems Inc.*, 510 U.S. at
22.

            Although Lujan claims that the totality of defendant's
retaliatory acts created a claim under a hostile work environment
theory, Lujan's case consists of essentially a retaliation claim.
A nearly identical situation occurred in *Sweeney v. West*, 149
F.3d 550 (7th Cir. 1998). In *Sweeney*, a female civilian employee
with the Army initially complained in 1988 that one of her male
supervisors invaded her personal locker, discriminating against
her on the basis of sex. In early 1991, she wrote formal and
informal letters, complaining of her treatment at work. Among
other things, her supervisor issued her counseling memos, which
the employee viewed as acts of retaliation. The employee
eventually brought suit, alleging discrimination and retaliation.
The court noted that the employee made almost no effort to
distinguish her claims of discrimination and retaliation. The
court stated that

> in support of her discrimination claim,
> [she] alludes to a 'hostile work
> environment,' but she uses that same
> term to describe how the Army acted once
> she complained about its discrimination.
> Indeed, nearly her entire appellate
> brief is devoted to documenting the
> Army's retaliation rather than the
> underlying discriminatory acts giving
> rise to her complaints in the first
> place. Now we are left to parse out a
> sex discrimination claim from what in
> all respects looks like a simple case of
> alleged retaliation.

*Id.* at 554. The court noted that her claim was unusual because
"hostile work environment" is a term of art typically associated

-20-

with sexual harassment, and the employee never claimed that she was sexually harassed. Rather, she contended that the Army created a hostile work environment because she filed an EEO complaint about her supervisor which triggered a series of retaliatory reprimands, admonishments and counseling statements. *Id.* at 556. The court found no evidence that she was mistreated because of her sex. To the contrary, the evidence showed that she was not well-liked because she disregarded the chain of command. Thus, the employee's claim of hostile work environment really referred to job performance decisions which were allegedly retaliatory in nature.

Similar to the allegations in *Sweeney*, Lujan uses the phrase "hostile work environment" to describe a workplace which she found abusive and unpleasant allegedly due to her reported complaints. Because Lujan does not claim a violation of Title VII because of her sex or race, no basis exists for a separate cause of action under a hostile work environment theory, which must stem from acts based upon plaintiff's race, color, sex, national origin, or religion. The term 'hostile work environment' is a term of art which the Supreme Court has defined as severe or pervasive harassment which is usually based upon sex, but has also been extended to race. Simply alleging that the environment at a workplace has become "hostile" as that word is used in every day language to mean repeatedly unpleasant or even aggressive, does not turn the claim into a "hostile work environment" claim under Title VII. In *Collins v. Mallinckrodt,*

-21-

*Chemical, Inc.*, 959 F.Supp. 1123, 1133-34 (E.D.Mo. 1996), the
plaintiff asked the court for reconsideration on her retaliation
claim, arguing that her retaliation claim was in the nature of a
hostile environment harassment claim because her employer engaged
in a course of conduct whereby she was subject to numerous
disciplinary actions along with increased job scrutiny, all after
complaining about sexual harassment.  The court noted that there
was no legal authority supporting the notion that a retaliation
claim in the nature of a hostile work environment claim could be
brought.  *Id.* at 1134.  Thus, the court discussed her retaliation
claim under the standard of whether any of the alleged
retaliatory acts constituted an adverse employment action and
whether the employer's retaliatory motive was the but-for cause
of the adverse employment action.  This Court will do the same
and analyze the evidence and Lujan's claims for retaliation under
the familiar three prong test.  Accordingly, while Lujan's
hostile work environment claim is not actionable as such, the
Court construes that portion of her claim to be part of her claim
of retaliation based on having filed her EEO complaints.

### B.  Retaliation Claim

To establish a prima facie case of retaliation the
plaintiff must show:

> (1) she was engaged in protected
> opposition to discrimination
> prohibited by Title VII;
>
> (2) she was subjected to adverse
> employment action; and

-22-

> (3) a causal connection existed
> between the protected activity and
> the adverse employment action.

*Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1262-63
(10th Cir. 1998); *Jeffries v. State of Kansas*, 147 F.3d 1220,
1231 (10th Cir. 1998). If the plaintiff establishes a prima
facie case, the burden of production shifts to the defendant to
produce a legitimate reason for its action. *Id.* at 1231. The
plaintiff may still prevail if she demonstrates that the
legitimate reason offered by the defendant was a pretext. *Id.*

## 1. Protected Opposition to Discrimination

First, Lujan must demonstrate that she engaged in
protected opposition to discrimination prohibited by Title VII.
It is not enough to show that she filed a complaint with the
EEOC. In order to satisfy this first requirement, plaintiff's
complaint must oppose conduct which is protected under Title VII,
namely conduct that is discriminatory because of plaintiff's
race, sex, national origin, or religion. In *Evans v. Kansas
City, Missouri School District*, 65 F.3d 98 (8th Cir. 1995), a
high school teacher at a staff meeting protested his employer's
plan for the school because he thought the plan failed to comply
with a desegregation order and disregarded the needs of the black
student population of the high school. The teacher claimed that
he was later retaliated against for making such a protest, and
ultimately fired. The court held that the employee's complaint
to his supervisor about the school's future did not allege any
discriminatory employment practice by the employer. *Id.* at 100-

101. As a result, the teacher did not engage in conduct protected by Title VII. The court noted that "Title VII is not a 'bad acts' statute" and held that the teacher's claim was "simply not remedial under Title VII." *Id.* at 101. The *Evans* case is particularly applicable to Lujan's claims because the vast majority, if not all, of her complaints allege conduct that could qualify only as 'bad acts.' The evidence at Lujan's trial was, at best, unclear as to whether Lujan ever filed a complaint with the EEO regarding unlawful employment practices which discriminated against her on the basis of her race, sex, national origin or religion. In most of her EEO complaints, Lujan describes the conduct against her as retaliatory acts. However, it is not enough to simply allege that an employer's conduct is retaliatory for plaintiff's past activity of filing complaints when those complaints were based upon unpleasant conditions at the workplace, but not conditions that were generated by plaintiff's race, color, sex, national origin or religion.

Thus, the Court finds that plaintiff has failed to establish the first prong of her retaliation claim. While further discussion is unnecessary, the Court will address the other elements of a retaliation claim.

## 2. Adverse Employment Action

Lujan must also satisfy the second requirement that she was subjected to adverse employment action. An adverse employment action has generally been defined as an action which alters the terms or conditions of the plaintiff's employment.

-24-

*Bennett v. Henderson*, 15 F.Supp.2d 1097, 1113 (D.Kan. 1998).
Determining whether a given employment action is adverse requires
case-by-case consideration. *Jeffries*, 47 F.3d at 1232. The
Tenth Circuit liberally defines adverse employment action in
recognition of the remedial nature of Title VII. *Jeffries*, 147
F.3d at 1232. Examples of actionable adverse employment actions
include disciplinary demotion, termination, unjustified
evaluations and reports, loss of normal work assignment, and
extension of a probationary period. *Bennett*, 15 F.Supp.2d at
1113. "Retaliatory conduct other than discharge or refusal to
hire is thus proscribed by Title VII only if it alters the
employee's 'compensation, terms, conditions, or privileges of
employment,' or 'adversely affect[s] his [or her] status as an
employee.'" *Sanchez v. Denver Public Schools*, 164 F.3d 527, 533
(10th Cir. 1998) (quoting *Robinson v. City of Pittsburgh*, 120
F.3d 1286, 1301 (3d Cir. 1997)).

        The Court previously disposed of some of Lujan's claims
of retaliation in ruling from the bench at trial. The Court
dismissed Lujan's claims based on the delay in addressing her EEO
complaints by the EEO office of DFAS and her claims premised on
whether she was represented by a union or not. In addition, the
Court addressed her retaliation claims as they related to her
failure to be paid overtime and for failure to address her sick
leave and administrative leave requests.

        After the Court issued a ruling from the bench, the
primary retaliation claims which remain include Lujan's claims

that she received poor performance ratings and was not granted
promotions. Lujan alleges that she was denied promotions on
January 6, 1992, February 1, 1992, July 20, 1992, January 25,
1993 and April 22, 1994. Failing to promote clearly affects a
plaintiff's terms of employment such that it constitutes an
adverse employment action. Lujan also alleges that she was given
negative performance evaluations. For instance, she received a
performance rating of "fully successful" in June 1993 when she
had previously received an "excellent" rating. Although Lujan
considered such an evaluation negative, the evaluation still
falls within the satisfactory range. Where the rating merited a
"meets expectations" score and the court found that the
evaluation was never used as the basis for an action against the
plaintiff, the evaluation did not constitute an adverse
employment action. *Merriweather v. Alabama Dept. of Public
Safety*, 17 F.Supp.2d 1260, 1274-75 (M.D.Ala. 1998). However,
unfair, negative employment ratings which are the basis for
removal of job responsibilities, demotion, transfer or
termination are sufficient to satisfy the adverse employment
requirement. *Id.* Thus, these evaluations could constitute
adverse employment actions if used in future hiring decisions.

          Other alleged retaliatory actions not addressed by the
Court at trial include Lujan's claims that she received
counseling memos concerning errors made in her work and oral
admonishments for not turning in her work when requested a day
early, and for walking out of a meeting when the supervisor

-26-

yelled at her. Supervisors giving a plaintiff a performance review that was lower than previous reviews but still within the range of satisfactory, publicly criticizing plaintiff's work performance, and mere criticism and counseling alone do not constitute adverse employment action. *Fiscus v. Triumph Group Operations, Inc.*, 24 F.Supp.2d 1229, 1241-42 (D.Kan. 1998). These actions by defendant are more akin to employers' intermediary decisions that do not affect employment conditions protected by Title VII. *Id.* Unsubstantiated oral reprimands and unnecessary derogatory comments are not included within the definition of adverse action absent evidence that they had some impact on the employee's employment status. *Sanchez*, 164 F.3d at 533. Where an employee received written counseling statements, for conduct she claims she did not engage in or should not have been responsible for, which recommended improved performance but stopped short of discipline, these acts could not constitute adverse employment action absent some job consequence accompanying those statements. *Sweeney v. West*, 149 F.3d 550, 555-56 (7th Cir. 1998). However, employer actions that can have an adverse impact on future employment opportunities are legitimately regarded as adverse employment actions. *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998). No evidence was presented that these counseling memos or oral admonishments resulted in discipline affecting her employment terms. Furthermore, the testimony of her supervisors establishes that it was plaintiff's work performance that generated the

counseling sessions. These counseling memos were not premised in any way on plaintiff's race or sex, and had no relationship to the events of 1987-88 upon which she premises her case. These events are four years or more after the Martin Luther King, Jr., incident. Neither Exhibits 48 or 49 allude to that incident, and the testimony from defendant's witnesses who served in a supervisory capacity over plaintiff all establish justifiable and non-discriminatory reasons for the actions taken.

Lujan also alleges that she was transferred to another unit and to another contract assignment in April 1993. Plaintiff presented no evidence that she suffered a loss of salary or benefits from this transfer, and therefore, it can be considered a lateral transfer. Lateral transfers without a substantive change in the terms of employment are usually not considered an adverse employment action. *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997). Plaintiff also alleges that she was requested to submit a report one day earlier than normal in retaliation and as a way to reprimand her when she could not fulfill such a request. (*See* Exhibit 92.) However, this request was made of every voucher examiner and not just the plaintiff.

Finally, Lujan alleges a host of acts by defendant which made her work environment unpleasant or hostile. In other words, the totality of these acts created a retaliatory and harassing workplace environment. For instance, Lujan claims that her supervisors raised their voices at her. Courts have held that yelling at employees, although unprofessional, does not

-28-

constitute adverse employment action. *Primes v. Reno*, 999
F.Supp. 1007, 1013 (N.D.Ohio 1998); *Munday v. Waste Management of
North American, Inc.*, 126 F.3d 239, 243 (4th Cir. 1997). Lujan
alleges that her supervisor Bennett requested her not to file
another complaint. Requests to drop an EEOC complaint which made
plaintiff feel frightened and intimidated do not constitute an
adverse employment action unless there were repeated and forceful
demands accompanied by veiled suggestions that failure to do so
would lead to termination or discipline. *Torres v. Pisano*, 116
F.3d 625, 640 (2nd Cir. 1997), *cert. den.*, 118 S.Ct. 563 (1997).
No such evidence was presented in this case.

Lujan also claims that her supervisors spied on her as
illustrated by her claim that they followed her to the restroom
when she took restroom breaks, a claim which the evidence clearly
refutes. Lujan claims that her supervisor ordered her to clean
up the folders around her desk, favored other employees, failed
to discipline other employees for socializing, failed to
establish objective policies for voucher examiners, refused to
let her examine her records under the Privacy Act, refused to let
her work over her lunch hour, made allegedly false remarks about
her work, and failed to issue her a quarterly award. These
alleged actions, even taken as a whole, do not rise to the level
of an adverse employment action which affected the terms of
Lujan's employment. Most of these grievances stem from Lujan's
conflicting view of how her workplace should be run. The Court
also finds that many of these allegations arose from Lujan's mis-

perceptions of reality. Title VII was not designed to redress personal grievances or purely job related workplace issues. *Chappell v. School Board of the City of Virginia Beach*, 12 F.Supp.2d 509, 516 (E.D.Va. 1998). Misunderstandings, personality conflicts and administrative matters do not constitute actionable retaliation. *Id.* Moreover, not everything that makes an employee unhappy qualifies as retaliation. *Sanchez*, 164 F.3d at 533 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1301 (3d Cir. 1997)). Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. *Id.* The aforementioned acts qualify as mere inconveniences or alterations of job responsibilities which are not considered adverse employment actions. *Id.* at 532. These acts involve job administration and daily employment decisions. Title VII should not be used to resolve what are essentially problems attributable to insensitive personnel management. *Batson v. Powell*, 912 F.Supp. 565, 579 (D.D.C. 1996).

### 3. Causal Connection

A plaintiff must prove a causal connection between the adverse employment action and the protected activity. A showing of retaliatory motive has long been relevant to the causation prong of a retaliation claim. *Gunnell*, 152 F.3d at 1263. For example, in a situation where the defendant's employee testified that her negative evaluation of plaintiff's job performance was

-30-

in no way influenced by another employee's opinion of plaintiff, plaintiff could not support the causation required in a retaliation claim. *Trujillo v. University of Colorado Health Sciences Center*, 157 F.3d 1211, 1216 (10th Cir. 1998). The plaintiff must prove that the defendant's action was intentionally retaliatory. *Gunnell*, 152 F.3d at 1263. The plaintiff must prove that her not being hired was motivated by an intent to unlawfully discriminate, as opposed to a mere mistake, favoritism or some other reason. *Sanchez v. Phillip Morris Inc.*, 992 F.2d 244, 248 (10th Cir. 1993). Incidents of rudeness are insufficient to support a claim for retaliation "given that Title VII neither is a 'general civility code' nor does it make actionable the 'ordinary tribulations of the workplace.'" *Gunnell*, 152 F.3d at 1265. The Tenth Circuit has recognized that tense personal relationships do not rise to the level of actionable retaliation. *Jeffries*, 147 F.3d at 1232. Federal law "does not guarantee a utopian workplace, or even a pleasant one. . . . [P]ersonality conflicts between employees are not the business of the federal courts." *Trujillo*, 157 F.3d at 1214 (quoting *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1164 (7th Cir. 1994)). Thus, none of the alleged retaliatory actions, whether taken by plaintiff's supervisors or co-workers, demonstrate the required retaliatory intent. The mere fact that plaintiff filed a complaint does not, in and of itself, create a reasonable inference that everything that happened after that point, which the plaintiff did not like, was caused by the fact

that she filed a complaint. *Chappell*, 12 F.Supp.2d at 517.
Clearly, plaintiff has a subjective belief that she was
retaliated against, but that alone is not enough. *Id.* At no
time has Lujan shown that she has been treated any differently
than other people because of the protected activity. The Court
finds that plaintiff has failed to prove a causal connection
between the claims of adverse employment action and her
complaints of retaliation.

### 4. Legitimate Business Reasons

Even assuming that plaintiff has proved a causal
connection, the defendant has offered legitimate business reasons
for its actions, which plaintiff has failed to refute, and there
is no substantive evidence that would permit the Court to find
that the business reasons given were pretextual.

### 5. Co-Worker Retaliatory Harassment

Nestled within Lujan's barrage of grievances are some
actions that were performed by Lujan's co-workers, rather than
Lujan's supervisors. For instances, Lujan claims that a co-
worker yelled at her when Lujan picked up the phone line which
the other employee was using. Lujan also generally complained
that her co-workers ignored her and did not invite her to join
them in activities. "[A]n employer can only be liable for co-
workers' retaliatory harassment where its supervisory or
management personnel either (1) orchestrate the harassment or (2)
know about the harassment and acquiesce in it in such a manner as
to condone and encourage the co-workers' actions." *Gunnell*, 152

F.3d at 1264. No evidence was presented that Lujan's supervisors orchestrated or instigated this kind of conduct because Lujan filed EEO complaints. Lujan did not present any evidence that Lujan's supervisors knew about these incidents or condoned them. Therefore, the defendant cannot be held liable for any of these alleged acts by co-workers.

### III. CONCLUSION

For the foregoing reasons, the Court finds that judgment should be entered for the defendant and plaintiff's complaint should be dismissed with prejudice. A judgment in conformity with this memorandum opinion will be entered this date.

DATED this _5__ day of May, 1999.

BY THE COURT:

LYLE E. STROM, Senior Judge
United States District Court